## Wray *vs.* Rhinelander, executor, &c.

The defendant's testator executed a lease to H. of certain premises for the term of twenty-one years from the 1st day of May, 1824, which contained a covenant on the part of the lessor for a new lease at the expiration of the term, for another period of twenty-one years. On the 1st day of March, 1844, a lease was executed and delivered to the plaintiff, as assignee of the original lessee, for a second term of twenty-one years, which contained a covenant that at the expiration of the said second term, the lessor would, at his election, either *grant a new lease of the premises for a further term of* twenty-one years, or that he would pay the party of the second part the value of "all such stone or brick buildings" as might have been "erected by the said party of the second part, his executors, administrators or assigns, on the said demised premises, and be then standing thereon." At the expiration of the second term, the defendant elected not to give a lease for a a third term, and refused to pay for certain stone and brick buildings on the premises, which had been erected by H. the original lessee.

*Held* that although the plain import of the clause in the second lease, respecting payment for the buildings, standing and considered by itself, was that the defendant would pay for such buildings only as the *plaintiff* erected; yet that other provisions contained in such lease, as well as in the original lease to H. indicated that a different construction should be given to it. And that as the second lease was given for the purpose of continuing and extending the term created by the first, the latter should be considered, so far as applicable, in ascertaining the construction to be placed upon the clause in question.

And the defendant having given the plaintiff the second lease without attempting therein to divest him of the title to the buildings which he had under the assignment to him of the first lease; the same expressly declaring that the plaintiff should continue to be the owner of the buildings, and should remain such owner even though a third lease should not be given to him; and securing to him the privilege of taking them away, provided he did so within ten days after the expiration of the term created by the second lease; *Held* that the buildings were not only the plaintiff's property, as the assignee of the first, and lessee of the second lease, but he was to remain owner of them, even though the defendant should conclude not to give the third lease.

And that the second lease should be *so construed as to render the defendant* liable to pay for such buildings, upon his refusal to give a new lease. And that thus construed, it imposed on the defendant the obligation of giving the plaintiff a new lease, in default of an election on his part to pay for the buildings.

APPEAL from a judgment recovered on a trial had at a special term, before a justice of this court, without a jury.

*S. P. Nash*, for the appellant. I. The first lease to Ward B. Howard ran from May, 1824, to May, 1845. Under this lease, stone and brick buildings were erected, which at the end of the term the landlord had the option to take at their appraised value, or, in lieu of taking them, to give a new lease. As between the landlord and tenant, these buildings, which were stores, were the property of the tenant and removable during the term. The lease treated the buildings as belonging to the tenant, and they could become the landlord's only on his paying their value. He elected not to take them, but elected to and did give a new lease. This left the ownership of the buildings in the tenant, unless it be shown that in adjusting the rent for the second term, the value of the buildings was deducted, as if, for instance, it had appeared that the annual rent was appraised, say at $900, if the tenant kept the buildings, or at $800, if at the end of the term they were to become the landlord's. There is no evidence of this kind. The original lease did not contemplate that the value of the buildings should enter into the appraisement of the rent. The provision was that the landlord should grant a new lease " upon such increase of rent " as should be determined by the appraisers [that is for the lots,] or pay the value of the buildings, to be determined in the same manner; the landlord " to make his election " within ten days after the appraisement " either to grant a new lease, as aforesaid, or to pay the value of the said buildings."

II. It may be safely assumed, then, that by the landlord's election to grant a new lease instead of paying for the buildings, the plaintiff, who then owned the buildings, did not lose his right to them. He owned them during the second term from 1845 to 1866. It was his, not the

Wray *v.* Rhinelander.

landlord's duty to keep them insured; it was his interest that was insurable, (*Mayor, &c.* v. *Brooklyn Fire Ins. Co.*, 41 *Barb.* 231,) and in case of loss, he could have used the money for the buildings, received from the insurance companies, to erect other buildings, and these substituted buildings, created out of the avails of the first, would, within the very letter of the second lease, be buildings "erected by the said party of the second part," to be paid for, in 1866, if the landlord declined to give the third lease.

III. Is there any thing then in the language of the second lease, expiring in 1866, which deprived the tenant of his right in the buildings then on the premises, and which were owned by him in 1845, when the term created by this lease began. There is only this; that the landlord, if he elects not to grant a new lease, is liable to pay for such buildings " as may have been erected by the said party of the second part," which the defendant claims to mean " erected during the term thereby created." No such expression is used, but the construction is claimed by entirely separating the second lease from the first, and arguing that the words " party of the second part," mean the party of the second part in this lease, and that as the plaintiff Wray became party of the second part in this lease, on the 1st May, 1845, no buildings could be said to have been erected by him, as party of the second part, except after the execution and delivery of the lease had given him that character; and that accordingly the lease should be read as though it contained the words " erected during the term hereby created." The landlord does not contend that he is not liable to pay for the buildings now on the premises, because they were erected by Howard, the first lessee, and not by the plaintiff, his assignee, but because they were erected during the first term. Had they been erected during that first term by the plaintiff, instead of Howard, the defendant's point would have been

the same. But the plaintiff contends that the construction claimed is strained and inequitable, and not the true one. (1.) A second lease given in pursuance of a covenant of renewal contained in a first, should be construed in connection with the first. (*Johnson* v. *Stagg*, 2 *John.* 510, 519, 520.) The covenant of renewal runs with the land, and is therefore more than a covenant; it is an estate. A mortgage of the first lease carries to the mortgagee the covenant of renewal, the buildings erected under it and the right to their value if the lease is not renewed. (*Piggot* v. *Mason*, 1 *Paige*, 412. *Thompson* v. *Rose*, 8 *Cowen*, 266.) If the two terms are to be construed together as one, (*Chretien* v. *Doney*, 1 *Comst.* 419 ; *House* v. *Burr*, 24 *Barb.* 525,) then the words "party of the second part," in the second lease included the party of the second part in the first lease; and this is the common sense construction. The words, party of the first and of the second part, in a lease, mean simply the lessor and lessee, the landlord and the tenant, and when successors and assigns are named, they are parties of the first or second part, to all intents and purposes, as much as the original parties. (2.) In the second lease, there is no provision that at the end of the term the buildings should belong to the landlord, but there is a covenant that at the end of the term the tenant shall surrender the premises "within good and sufficient fence," or, as the margin says (not shown in the case as printed,) "premises to be left enclosed;" clearly implying that all that the landlord owned was the ground. If, as now claimed, he became the owner of the buildings upon the execution of the second lease, and by that lease rented the land and buildings, he would have inserted a covenant by the tenant to keep in repair. Again, the provision in reference to the covenants which the third lease should contain, if the landlord elected to give a third lease, shows that it was never contemplated that the buildings, no matter when

Wray *v.* Rhinelander.

erected, should belong to the landlord. The language is "such new lease, (*i. e.* third lease,) to contain the like covenants as are herein, (*i. e.* in this second lease,) contained, except only so far as regards a further renewal of the said lease, or the payment of the value of any building erected and standing on the premises (it does not say erected by the party of the second part,) and in lieu of such covenants and provisions with respect to a renewal of said lease, or the payment of the value of any buildings erected and standing on the premises (thus interpreting, as the plaintiff now does, the covenants in the second lease,) such new lease (the third,) to contain a provision that at the expiration of the term thereby granted, (1887,) all such stone and brick buildings shall be deemed the property of the said party of the second part," &c. who may take them down, &c. leaving "the said premises enclosed within good and sufficient fence as aforesaid." Is it not clear that if the third lease had been granted. the buildings erected during the first term, which the landlord now claims to be his, would, under these provisions he held to belong to the tenant? (3.) It is conceded that the landlord is liable to pay for the present buildings had they been erected during the second term, that is since 1845. What difference does it make to him whether they were erected during the first term, say in 1840; or the second, say in 1846, unless he has already paid for the buildings erected on the ground in 1845. He has given no evidence of having done this, but assumes that they became his by operation of law, by reason of his having given a second lease at an increased rent. It is said, however, that the covenant as it stands is an inducement to the tenant to keep the property improved, to rebuild, for instance, in case of fire. He would have the same inducement if the covenant were to pay for all the buildings standing on the premises at the end of the term, and whether the buildings were erected in 1840 or 1846 the

only difference to the landlord would be that they would be newer or older. In either case, however, the landlord is to pay only the real value as appraised. But if the tenant can get pay for buildings erected during the second term, but not for those erected during the first, his interest would be to well insure the old buildings, have them burn up and others rebuilt. The construction claimed by the landlord has no argument in its favor, except that it seems to offer a temptation to arson and fraud. (4.) This ingenious point of the landlord would appear to be an afterthought. If he is not liable to pay for the buildings now on the premises, why did he go into an appraisement? If there was nothing to elect between, there was no need to go through the formalities of arranging two sham alternatives. It would seem as though disappointed by the rental fixed by the appraisers, he had fallen back on a quibble. (5.) The common sense construction claimed by the plaintiff is sanctioned by the case of *Van Rensselaer* v. *Penniman,* (6 *Wend.* 569.) In that lease one Henry Cuyler or his assigns, the lessee in a lease for lives, was on the events named in the lease, entitled to be paid for buildings and improvements. Before the termination of the lease, owing to a change in the landlord's title by reason of the law abolishing entails, a new lease was given. The first lease was given in 1766, the second in 1796. This second lease provided in the same language as the first, that the landlord should pay for "all the buildings and improvements that may be made on the said lands by the said Henry Cuyler, his assigns, &c. to be valued. Before this second lease, Cuyler had made valuable improvements. In 1803 he died. In 1826, the defendant Penniman acquired his title. In 1828, the last life on which the lease depended fell in, and the heirs of the original landlord proceeded to enforce their rights, claiming that they were liable to pay only for improvements made under the second lease. An ejectment suit was brought on the defendant's refusing to

Wray *v.* Rhinelander.

surrender except on payment for improvements under both leases. The plaintiff claimed that the acceptance of the second lease operated a surrender of the first, and that, therefore, the defendant could only claim under the second, and consequently, as the defendant claims here, only for improvements made after the date of its execution. The court held that the acceptance of the second lease was not a surrender of the first, but that if it were the words in the second lease "buildings and improvements that may be made," should be read, "that may have been made," and gave to the tenant the value of all the improvements made under both leases. That the case is in point will be seen by substituting the name "Stephen Wray," (the plaintiff,) instead of the words "party of the second part." Then the covenant now under examination will read thus: And it is mutually agreed, that at the expiration of the said term, the party of the first part will, at his election, either grant a new lease, to contain the covenants specified, or shall and will pay unto the said Stephen Wray, his executors, administrators or assigns, the value in good and lawful money, of all such stone and brick buildings as may have been erected by the said Stephen Wray, his executors, administrators or assigns, on the said demised premises, and be then standing thereon." Under this language, Stephen Wray would most clearly be entitled to pay for the present buildings, and there would be no point to make in opposition to his claim, except the point which the defendant does not make, that the buildings were erected by Howard, the first tenant, not by Wray, his assignor; as in the case in 6 *Wendell,* by Cuyler, the first tenant, not by Penniman, the second. But the sound construction is, that the words "party of the second part" are *nomen collectivum,* including the original tenant and his successor, the tenant in the second lease and his predecessor.

IV. There was sufficient ground to ask for a reformation of the language of the lease, as it was sought to conclude the plaintiff by a strained construction of its letter. By a fair construction of it, no reformation was needed, and if the court had so held, the right to retain the case and award damages, would have followed, if damages were the proper relief due to the plaintiff. (*N. Y. Ice. Co.* v. *N. W. Ins. Co.*, 23 *N. Y. Rep.* 357.)

V. The provisions of the lease as to the appraisement were all complied with, and then by the terms of the lease, the landlord was, within ten days after the appraisement was notified to him, to make his election, either to grant a new lease, or to pay for the buildings. He made an election in form, but it was in substance that he would not grant a new lease, and he would not pay for the buildings, because they had not been erected during the term. The election then passed to the tenant. He offered, as he testifies, to take the lease, and the landlord refused to give it, and refused also to pay for the buildings. The plaintiff was then entitled to a new lease, in accordance with the covenant. (*McNitt* v. *Clark*, 7 *John.* 464.)

VI. Among the findings there is one that the plaintiff at the end of the term (May 1st, 1866,) surrendered the premises. If this implies that he surrendered his rights, there is no warrant for the finding. The plaintiff was not personally in possession. His tenants were in actual possession, and to them the defendant, repudiating his obligations to the plaintiff, gave new leases. The plaintiff could do nothing but apply to the courts. His term having expired, he could do nothing against his own tenants. His rights rested in covenant merely, so far as they were concerned, and his possession expired with his term. He has lost nothing by not making an ineffectual resistance to the landlord's resuming possession. (*Linneman* v. *Patton, MS.*)

Wray *v.* Rhinelander.

*H. H. Anderson,* for the respondent. I. The plaintiff was entitled to no relief under the lease as it was executed between the parties. That lease was complete in itself, and the rights of the parties are to be determined by it, unvaried by any parol evidence, unless a case is made for reformation. What are the terms of the lease? 1. It contains a demise for twenty-one years from May 1, 1845, at at the rent of $900 per annum, with covenant for quiet enjoyment upon payment of rent, &c. 2. It contains a covenant on the part of the lessee to quit and surrender the premises at the end of such term. Both of these covenants have been performed by the respective parties. 3. It contains an agreement, on the part of the lessor, as follows: " That at the expiration of the term of twenty-one years, he or his assigns shall and will, at their election, either give a new lease for twenty-one years, *or* pay to the party of the second part, his executors, administrators or assigns, the value of all such stone or brick buildings as may have been erected by said party of the second part, his executors, administrators or assigns, on the said demised premises, and be then standing thereon;" that is to say, the lessor, for the benefit of the estate of which he was trustee, retained an absolute right to possession of the premises at the expiration of the long term of twenty-one years; but he agreed, that if the lessee or his assigns should have erected any stone or brick buildings upon the premises, in case the persons entitled to the estate at the end of the lease should be unwilling to give a new lease at such rent as should be agreed on by appraisers, the lessee or his assigns should be paid for the buildings so erected by him or them. There was no other obligation between the parties. The lessee enjoyed the premises during the term; the lessor received the rent, each having an equivalent from the other. No further obligation was created, unless the lessee erected brick or stone buildings

on the premises. In that event, if the lessor was unwilling to give a new lease, he became liable to pay the value of the buildings, to be ascertained by appraisement. At the expiration of the lease from the defendant to the plaintiff, the defendant exercised his unquestionable right and declined to give a new lease. As the lessee had erected no stone or brick buildings on the premises, the rights and obligations of the respective parties to each other terminated upon the surrender of the premises, by the plaintiff to the defendant, and an acceptance by him. This would seem to be an end of the plaintiff's case.

II. The plaintiff seems to agree to the correctness of the view presented above, as he prays that the lease be reformed, so as to entitle him to compensation for the buildings erected during the lease from William Rhinelander to Ward B. Howard; but he shows no case for a reformation, and the court so found. 1. He mistakes the effect of the lease from William Rhinelander to Howard. That lease terminated May 1, 1845, and with it all rights between the parties to such lease. The lessor, by that lease was to do one of two things, at his option. He was not to do both. He was either to grant a new lease, or he was to pay the lessee the value of such buildings as such lessee might have erected upon the premises. He had the privilege of election which he would do. When he had exercised that election, the covenant was fulfilled and the agreement performed. No obligation existed thereafter in regard to the buildings, as between lessor and lessee, and upon the granting of the lease, the buildings became the property of the lessor, discharged of this covenant. 2. But even were this otherwise, and even if the plaintiff might have insisted at the time he took the lease from the defendant, that provision should have been made for payment for these buildings, in case he should not erect any himself during the new term granted, he did not so insist, and he has shown no case calling for the

Wray *v.* Rhinelander.

interposition of the court in the exercise of its powers to change the agreement so executed between the parties.

The defendant was solicited to give a new lease, and for the convenience and as a favor to the plaintiff, to anticipate the time when he would, under other circumstances, make his election. He yielded to the request of the plaintiff, offered to give the lease, which was given, at the rent of $900 per annum. He sent leases signed by himself to the plaintiff, who executed them, and then sent one to the register's office to be recorded. The lease is substantially like the lease from William Rhinelander. The plaintiff says he did not read it; but that is not the defendant's fault. The plaintiff does not pretend that he could not read, or that any undue or improper influence was used to induce him to sign it. He says that he has never read it nor seen it since. But surely the defendant was not to be prejudiced by this omission on the part of the plaintiff. The instrument had been recorded in the register's office more than twenty-two years; and the court below held that the plaintiff could not be permitted to say that the record, which had been notice of the lease and its contents to all the world, was not notice to him also. It was not even pretended that the defendant ever agreed to or thought of giving such an instrument as the plaintiff by this action desired the court to make for him; nor was there any evidence tending to show that if the plaintiff had in 1844, insisted upon the insertion in the lease of a provision that at the expiration of the new term of twenty-one years, the defendant should pay the plaintiff for the buildings erected by Howard, the defendant would have been willing to give any such lease. In order to entitle the plaintiff to a reformation, it was necessary for him to show that the defendant intended to make such an agreement, and there was no evidence tending to show any such thing. (*Mortimer* v. *Shortall*, 2 *Dru. & War.* 363. *Davis* v. *Fitton, Id.* 225.) 3. But if this plaintiff had any

rights under the first lease not secured to him by the second, he has slept upon them so long, that a court of equity will not now aid him. Whether he chose to read it or not, he is chargeable with notice of the contents of this lease, from the time of its record in 1844; and this court will not let him remain for twenty-two years, till the only disinterested person who could testify as to what transpired when the lease was signed by the plaintiff, is dead, and then claim to change the form and effect of the instrument, by the plaintiff's imperfect recollection of a brief conversation at that remote period. The plaintiff's recollection is imperfect, necessarily so, from the nature of things—for the events happened long ago, and shown to be so, for he does not recollect correctly the rent paid under the former lease. He says the rent was $450 per annum; the lease shows it to have been but $400. The court will not interfere to reform, unless the evidence as to the mistake of the parties, and as to their intention, is perfectly clear and satisfactory. (*Beaumont* v. *Bradley*, *T. & R.* 41. *Marq. of Breadalbane* v. *Marq. of Chandos*, 2 *Myl. & Cr.* 711.)

III. The plaintiff presented no claims whatever to the equitable interference of the court. He had no claim on the defendant, who, standing in the position of trustee, did only what his duty required, and exercised for the benefit of the estate, an option secured to him by the terms of the lease under which it was intended to secure what the defendant claimed and received from the court below.

*By the Court*, DANIELS, J. The plaintiff brought this action for the purpose of procuring the specific performance of a covenant made by the defendant for the execution of a new lease of certain premises previously demised to him as the assignee of Ward B. Howard. It appeared by the evidence, as well as the conclusion of fact found by the court to be proved by it, that the defendant's

testator, (William Rhinelander, deceased,) executed and delivered to Ward B. Howard a lease of the premises in controversy, for the term of twenty-one years from the 1st day of May, 1824. This lease contained a covenant on the part of the lessor for a new lease at the expiration of the term, for another period of twenty-one years. And on the 1st day of March, 1844, a lease was executed and delivered by the defendant to the plaintiff, for the second term of twenty-one years. This lease contained a covenant for a third, for a similar term, after the expiration of that created by the second, in case the defendant should not elect to pay for certain buildings erected and at that time standing upon the demised premises. What buildings these were that the defendant agreed to pay for in case he declined to give a third lease for twenty-one years, constitutes the substantial point in the present controversy. The plaintiff insists that they are all the brick and stone buildings erected upon the demised premises at any time during the tenancy created by the first and second leases, and standing thereon at the expiration of the second term. While the defendant insists that they are only such buildings as have been erected by the plaintiff. And as he has created none, the defendant in that view, would be bound to pay for none.

The defendant's position in this respect is taken under the language used in the second lease, which was given to the plaintiff, for the purpose of designating the buildings which were to be made the subject of the payment. This language, taken in its literal sense, will readily sustain that position. For the terms used are that the defendant shall pay the value " of all such stone and brick buildings as may have been erected by the " plaintiff, who was " the party of the second part."

On the 21st of February, 1866, the defendant gave the plaintiff notice that he had made his election not to grant a new lease of the premises, but to pay the value of any

stone or brick buildings which had been erected. thereon "by the lessee or his assigns during the term of said lease."

The object to be attained in construing agreements, is to ascertain from them what was the intention of the parties to them. And that is commonly done by giving the words used by them, their ordinary and popular meaning. For where nothing is found manifesting any different conclusion, it is properly presumed that the parties made use of them, in that manner. But as language is often carelessly, and inadvertently made use of, even in instruments of the most deliberate and solemn character, that presumption is not to be followed, where from an examination of the entire agreement, it becomes apparent that by following it, a result will be produced not within the contemplation of the parties. In this case the plain import of this clause, standing and considered by itself, is that the defendant will pay for such buildings only as the plaintiff erected upon the premises. But other clauses are contained in the lease to the plaintiff, as well as in the preceding lease given to Howard, indicating that a different construction should be given to that clause. And as the second lease was given for the purpose of continuing and extending the term created by the first, the latter should be considered, so far as it may be applicable, in ascertaining the construction which must be placed upon the clause in controversy.

The buildings for which payment was demanded by the plaintiff, were erected by Howard, the tenant to whom the first lease was executed and delivered. By the express terms of that lease, the estate demised to him was assignable. For the demise was to him, his executors, administrators and assigns. And in case of an assignment of the lease, the obligation of the lessor to pay for the buildings, in case of a refusal to execute a second lease, afterwards existed in favor of the assignee. That was clearly im-

ported by the language contained in the first lease. This lease was afterwards assigned by the lessee named in it, and the plaintiff became the owner of it, as assignee.

When, therefore, the time arrived for the lessor to elect whether he would give a new lease for the further term of twenty-one·years, or pay for the buildings erected by the lessee upon the land, that election was to be exercised exclusively in the plaintiff's favor. If the defendant, who had then become the executor of the lessor in the first lease, had elected not to give the second lease, he would have been legally bound to pay the plaintiff the value of the buildings, which Howard had erected on the demised premises. So that, practically and legally, the plaintiff was at that time the owner of these buildings, and the only way in which the defendant could have acquired title to them, would have been by paying the plaintiff for them. Instead, however, of doing that, the defendant gave the second lease. And that was done before the term expired, which had been created by the first lease. But no attempt was made, in the second lease, to divest the plaintiff of the title which he had, under the assignment to him of the first lease, to the buildings. On the contrary, the second lease expressly declared that the plaintiff should continue to be the owner of these buildings, and should remain owner of them, even though a third lease should not be given to him. And the privilege was secured to him of taking them away, provided he did so within ten days after the expiration of the term created by the second lease.

It is clear, therefore, that these buildings were not only the plaintiff's property, as assignee of the first and lessee in the second lease, but beyond that he was to remain owner of them, even though the defendant should conclude not to give the third lease, at the expiration of the term created by the second lease. It could not for that reason have been intended by the parties, that the defend-

ant should become the owner of the buildings by reason of the giving of the second lease. In· addition to that, there is nothing contained either in the first or the second lease, in any manner indicating that the defendant could lawfully become the owner of these buildings, at any time, in any other way than by paying the plaintiff, or his representatives or assigns, for them. This conclusion is sustained by the clause already mentioned, contained in the second lease under which the defendant claims these buildings. For, by the literal reading of that clause, Howard, the first tenant, would have been entitled to be paid · for those buildings, if the second lease had been assigned by the plaintiff to ,him, before the term created in it had expired. And this would not have been the case if it had been intended that the defendant was to become the owner of the buildings when the second lease expired, without making any payment at all for them. Neither could it have been intended that the plaintiff should be divested of his title which he had acquired to the buildings under the assignment of the first lease, without some consideration or equivalent being secured to him for the loss of his title. And yet no such consideration or equivalent has been in any way provided for him, unless the defendant be obligated to pay, on account of his refusal to execute the third lease.

As the case is presented, the defendant was bound to pay for these buildings when he refused to give the new lease. And if the second lease had been assigned to Howard for the purpose of bringing the claim for the payment within the literal terms of that lease, he would have received the money, then, only as the trustee of the plaintiff. For by his assignment to the plaintiff, his own right to it had been acquired by the latter.

The truth of the matter seems to have been that the second lease was copied very much from ·the first one. And when the clause in controversy was inserted, it was

Wray *v.* Rhinelander.

done in the same terms that had been used for the same purpose in the first lease, without changing it so far as to adapt it to the changed circumstances produced by the assignment. From the other clauses contained in the lease, it appears that the lessor treated the plaintiff as the substantial lessee of the premises from the beginning, and as such, entitled to all the rights and obligations created in favor of the original tenant. And full effect can only be given to the authority conferred on Howard to transfer his rights and interests under the first lease, by holding that the plaintiff continued to maintain that relation to the defendant after he had received the second lease. And that should be held to be his relation to the defendant, notwithstanding the restricted nature of the language used in the clause in question. For in no other way can full effect be given to the other portions of the lease, affecting this subject. And those portions appear to indicate the paramount purpose and object of the parties. It was clearly designed that the plaintiff should only be deprived of his title to the buildings, by being paid for them; and in conformity with that design, this clause in the second lease should be so construed as to render the defendant liable to pay for them, unless a third lease be given to the plaintiff.

When this clause is thus construed, it imposes upon the defendant the obligation of giving the plaintiff a new lease in default of the election on his part to pay for the buildings. He did not elect to make such payment, and the result, therefore, follows, that the plaintiff is entitled to a new lease. The judgment should be reversed.

[NEW YORK GENERAL TERM, November 2, 1868. *Ingraham, Mullin* and *Daniels,* Justices.]